Good morning. My name is Vincent Loxamana, and I'm here on behalf of my client, Jose Agustin Romero-Bustamante. I'd like to begin with just a brief return to some factual issues that I think bear on this case, and that is to iterate the fact that my client lived in a house that abutted the international border between the United States and Mexico in Nogales, Arizona. It's actually a portion of the United States right now that is more like a demilitarized zone than it is a civilian housing area in that there's a series of cameras along the international border. A few of these cameras actually look into the yard that is my client's yard. And because of the porous nature of the international border, there is just a mass influx all the time, day and night, of people through this area. It's a residential neighborhood. There are two ports of entries along the border, but there's also residential housing that extends east and west from the international ports of entry. So this is one of those areas of the United States where people pass in their attempts to come into the United States, find employment, and look farther north. As part of their surveillance, they have agents that are monitoring these cameras that look into the people's yards and see the activity that occurs. In this particular case, the agent who was monitoring the cameras around midnight, and this is on controverted testimony, says that he saw people come into my client's backyard. Then he loses track of them because it's just the back part. So when the agent that comes on for the morning shift is advised of this, she monitors what she sees on the cameras looking into my client's backyard, and she sees other individuals approximately 7.30 in the morning. She radios this to agents who might be in the vicinity who respond. They find nothing. Later on in the morning, it's not even in the morning. It's probably 12.50, 1 o'clock in the afternoon. Agents respond. Three of them go to my client's house. One of the agents has a bit of a history with the client. My client's daughter had gotten into an altercation with the Border Patrol agent, so I guess in the eyes of the Border Patrol, they're possibly notorious. And I think that's one of the things that he says and also that the monitoring agent says is that there's people here all the time. So the government agents go to my client's house approximately six hours after the last verified incident of undocumented alien traffic and use that as their justification to go to my client's house. Ostensibly, the reason they go there is to conduct a knock and talk. My client's position is that if they have cameras and there's three agents and it's pretty specific as to what they believe the probable cause is for their presence, then they should have a warrant because there are three agents there. This house is not going anywhere. This is a private dwelling. I think the Fourth Amendment is clear that private dwellings are protected, notwithstanding the fact that they are near the international border. Can I narrow in on what I think may be the issue or the issues here? It appears that there may have been consent to come into the house, but if there was consent to come into the house, it was specifically only as to the house. That's correct. The aliens were found in the backyard, and therefore whatever permission there was or was not did not apply to the backyard. The authority that the government seeks to exercise for the search and then seizure in the backyard is based upon the statute. That's correct. They had no warrant. Did they have probable cause? Did they have some other basis for doing it? Does the statute eliminate the need for a warrant or probable cause? I'd mostly like to focus on what authority was there for seizing in the backyard. I guess I would refer back to the Santa Maria case for the answer to that question. In that case, there was only a barbed wire fence surrounding open lands, and the dwelling was not a dwelling. It was a trailer that was detached. And that's much more of an instance where that is open land. You can see through it. My client's property is fenced on all sides. So in order to be in there looking in the yard, they have to be in my client's dwelling. And so one of the issues that has to do with the consent, and it's kind of a unique issue, is that my client had called an attorney who was representing his daughter. The attorney is telling my client to tell the agents no, they don't have the consent to be there. And the agents testified that they said, if you don't tell us, we can come in, we're just going to go get a warrant. They say that he gave them consent. I think ---- Excuse me, counsel. Isn't there then a question of what he gave consent to, and what is the definition of dwelling in this case? I suppose that's probably the crux of the issue. What is the dwelling? Is it the fenced yard or is it just the inside of the house? Does it include the curtilage or what does it include? My position is that if it's fenced in, it should include that. And so if my client is telling the agents they don't have consent, there's no exigent circumstances, then there's really no reason that they can't go and get a warrant, because they have cameras. They can demonstrate to a magistrate. We agree with you. They didn't get a warrant and they went in. And the question is whether that was legal. What helps us with the definition of a dwelling? Does the legislative history help us? You have this long, long, long border with residences all the way along. Clearly, if they have a warrant, they can come in. The question is, may those border agents go in all those backyards? Well, I think that's the problem here. I don't know that you're going to always come up with a bright-line test because there are so many variances, so many permutations that, you know, I think if you get to a bright-line test for every situation, it's just not going to work. But the statute does say except to enter dwellings. If the protection of the law has been extended to open lands, and I think that's part of the legislative history is that at the time there were people that said, no, you can't come on our property. And it's just because it's such a vast, expansive property, the statute was passed to allow the agents to go on the property to look for aliens. In this case, it's a little bit more tightly construed than that. That's a bit more of a telescope because you've got wide-open property. You've got a barbed wire. You can see pretty much everything. That's not the case here. We have a house that's surrounded by a fence. It happens to abut the border. But you have to place yourself into a position to be looking into the property by going onto the dwelling physical premises visually or physically in order to be there. And that's where I believe that the ambit of the statute does not apply. I think that's overreaching. Okay. At this point, I think we have your argument in hand. Why don't we hear from the government? And you've got two minutes and a little more to respond after you've heard from the government. Thank you. May it please the Court. Mr. Laksamana. Good morning. I'm Eric Markovich. I'm Assistant United States Attorney in the Tucson office. I'm going to just kind of jump right in where Mr. Laksamana left off and where the Court was making some inquiry with respect to how do we define or how do we know what a dwelling is under this statute, which is United States Code Section 1357. I think the definition of dwelling was defined by this Court within the Santa Maria case and the Pacheco-Ruiz case. In the Pacheco-Ruiz case, the Court said that the crossface or basement underneath the house constituted part of the dwelling. And in that case, the Court held that the search of that area was improper. And are you saying that the statute authorizes warrantless searches inside the curtilage? Yes, I am, Your Honor, because And what authority do you have for that? I think the Santa Maria case and also the Pacheco-Ruiz case, I think the Santa Maria case is very similar to the case at hand. In that case, agents who had a dual drug and immigration purpose were entering Mr. Santa Maria's land in that case. And that land was enclosed by barbed wire. There was evidence that the agents crossed either over or under that barbed wire and through a gate onto his land. And they went too far in searching the trailer on that land. And in that case, the Court noted really the reason they went too far is because the only thing they were looking for in that trailer was drugs. There was no evidence they were looking for illegal aliens in that trailer. And I think the same thing is true here. Is there a distinction between within the boundaries of private property and, on the one hand, and within the curtilage of a dwelling on the other? Your Honor, I don't think there would be a need for this statute if it didn't encompass the curtilage, because otherwise there would be no Fourth Amendment protection applicable to the land. If the statute was meant to apply to only open fields, then there's really no need for it because there's not going to be a Fourth Amendment protection to those areas. And that's why Oh, are you saying then that the statute overrides the Fourth Amendment? No, of course not. Is that what you're saying? Of course not. Then what are you saying? Well, I'm saying that in this case, the statute provides that agents may enter upon the curtilage. And I think Santa Maria, in that case, this Court expressly found or at least noted the rule that the Court is to construe statutes constitutional when possible. And in that case, I believe the Court did construe this statute constitutional under the facts of the Santa Maria case. Basically, this statute is in line with the Fourth Amendment. You know, counsel, I had trouble with that, because under your interpretation, it would mean that it would authorize Federal agents to conduct searches of every backyard in metropolitan San Diego, or Detroit for that matter, cities that are well within the 25-mile, so this country's border with both Mexico and Canada. You said it isn't abolishing the Fourth Amendment. What is it doing? Well, Your Honor, I don't think it is authorizing searches per se. I think it's authorizing the agents to enter the land to apprehend illegal aliens from a practical perspective, allowing these agents to get on individuals' lands to carry out their law enforcement function instead of ---- Well, law enforcement without a warrant in this case. They could call a police officer with a warrant, clearly, to go in. The question is whether the border agents can do it. Well, I think that in this case, the district court ---- I don't think a warrant would have been possible in this case, because the district court, I think, made a factual finding that there wasn't reasonable suspicion for the agents to be at the home. And in this case, there really wouldn't have been facts that would have ---- the government wouldn't have been able to obtain a warrant in this case. But I think that this ---- Oh, well, if they got problems, then they couldn't have got a warrant. They couldn't have got a warrant for the search of the house. I think the district court made a factual finding that at the point the agents arrive at the house, there's no reasonable suspicion. But they ---- and they ---- Let me focus on consent, and then we'll come back to curtilage. How far did the consent go? The house itself, but not the backyard? Your Honor, I think the consent did go to the house itself. I think that there ---- And not the backyard? I don't think it did. I think the agents ---- That's the way I read the record, too. So really, we're after not consent here. We're after whether or not the statute allows us to dispense with the warrant requirement. I agree that the ---- Okay. Yes, Your Honor. The consent issue, I think, is really irrelevant to the appeal. I think the crux of the issue is whether this statute permits the agents to do what they did, that being be on the defendant's land and then respond to a noise in the backyard. And what do you do with the following language out of the Oliver case from the United States Supreme Court? And I'm now quoting from Justice Powell's opinion. At common law, this is the court, at common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, quoting Boyd, and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage, and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. Now, that tells me that the curtilage is protected by the Fourth Amendment. And I don't dispute that at all, Your Honor. I agree, and this court has held that numerous times. Okay. So why is this backyard not part of the curtilage? Well, I think that this backyard, assuming it is part of the curtilage, I think the statute still gets the agents onto the land. And not only the statute. I refer this court to its decision in the Hamlet case where it said, basically, agents could, without reasonable suspicion, go up and do a knock and talk. And on that case, agents, when they didn't get an answer, went to the back door, which is essentially what happened here. For officer safety, one of the agents was left in the driveway area, Agent Adams. At some point, the front door closes. Agent Feldman advises Agent Adams that the front door closes. He hears a noise in the backyard. He responds to that noise in the backyard, pursuant to the statutory authority. And also, as the district court actually noted, there were officer safety reasons for that. And I think that's one other reason that would justify the agent going into the backyard and once there, seeing the aliens within plain view. And I didn't provide this site to the court, but if the court were to conclude that this statute is either unconstitutional or inapplicable to the facts of this case, there's a case that was fairly recently decided by this court in the United States v. Insland, which is the 315. Did you previously submit this by a 28-J letter? Your Honor, I did not submit it. As preparing for this argument, it kind of came to me that I should have a backup argument in the event that the court would find this. Any of you notified counsel of this case? I haven't, Your Honor. What you should do then at the conclusion of argument, if you could just write on a piece of paper the case name and citation, give it to the clerk and give it to opposing counsel. That would be useful. I will do that. Sorry about that, Your Honor. That's okay. And as far as the cartilage goes, I really think, at least the government's position, that the Santa Maria case is on point here. In that case, the agents were within the cartilage of the property. I think it's very clear that that was the case. And in that case, there was no disputes. The agents were lawfully on the defendant's property, given that their purpose was to search for illegal aliens. The point at which it was improper is the point where they're looking solely for drugs, something which the statute doesn't authorize. And I think the court made clear in Santa Maria that the agents were on the cartilage because the government in that case actually took the position that the trailer was an open field. It was akin to a stranded tree, something deserving of no Fourth Amendment protection. So I think that for that reason, the case at hand factually is identical to Santa Maria, except the agents in this case didn't go to the further step. They didn't look in a dwelling. They didn't search a dwelling. They were merely within the defendant's land, saw the aliens within plain view. Could I ask one question? Where in the record does it say that the reason for the search of the backyard was officer safety? Within the record, the search of the backyard, it's not within the record that he went to the backyard for officer safety. The district court noted in its opinion on the supplemental, I'm giving you a SER site, page 94, that it was reasonable and prudent for agents to leave another agent outside the residence for the purpose of providing for officer safety. That may be, but where does it say that the reason he went from the street to the backyard was to protect the officers in the house? I don't believe there is any. I think that's a reasonable impression that can be drawn. I don't think that there's a – So there's actually no finding on that point? No, there's no factual finding by the district court, no. Are there any further questions? I think not. Thank you very much. And you've saved a little over two minutes. Thank you, Judge. Appreciate it. I'll try not to take full two minutes. Okay. What's occurring is that there's a balancing that's occurring between the needs of law enforcement and the privacy interests of an individual. It can't be the case that just because you live on the international border, you abrogate your rights to privacy. They may be looking in your yard all the time, but it doesn't mean that you have given a consent to agents to be on your property all the time. If they've got cameras trained on your backyard and they think that there's somebody there, there's nothing to prevent them from going and getting a warrant, and that's really the reason we're here. They think they had enough to go there and look. They say they were doing a knock and talk, but these aren't full of brush salesmen coming up to the door to say, hey, will you take a look at our project? They are showing up. They're going in. They're not going away.  whether he's talking to a lawyer, these are officers who are charged with enforcing the law. They're not going anywhere. They are there to get in the house one way or the other. I think the proper way for them to do it in this case was to have gotten the warrant. There's no reason they couldn't have. It would have taken a little more time to call on the radio to get a warrant. What would that have been, five, ten minutes, maybe 15? I don't know. I'm speculating. But there's no reason that it couldn't have been done in this case, and I think the Fourth Amendment requires that in this case, these circumstances, these facts, that should have been the way that it was conducted. They had enough information to do that, or they didn't. Thank you. Okay. Thank you very much. Thank counsel on both sides for the argument in this case. Romero-Bustamante, it is now submitted for decision.
judges: Dw Nelson, W. Fletcher, Alsup